UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **SEP 1 2 2016**

Lisa Marquez,

                    Plaintiff,

        –v–

City of New York *et al.*,

                    Defendants.

14-CV-8185 (AJN)

MEMORANDUM
AND ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Lisa Marquez brings this action against her former employer the City of New

York (the "City"), the New York City Police Department (the "NYPD"), and Lieutenant Ruben

Castro in his individual capacity (together, "Defendants"), alleging that they discriminated

against her on the basis of gender by subjecting her to sexual harassment and then unlawfully

retaliated when she complained of the harassment.  Marquez asserts claims under Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and the New York City

Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107, *et seq.*  Before the Court is

Defendants' motion for summary judgment on all claims.  Dkt. No. 62.  For the reasons

articulated below, Defendants' motion is GRANTED.

## I.        Background

The following is drawn from the parties' Local Rule 56.1 statements, the deposition

testimony of Plaintiff Lisa Marquez and Defendant Ruben Castro, and other exhibits submitted

by the parties.[1]

---

[1] The Court notes that Plaintiff's Rule 56.1 response and supplemental affirmative statement cite, in several
instances, solely to allegations contained in Plaintiff's unverified complaint. *See, e.g.*, Plaintiff's Response to
Defendants' Statement of Undisputed Material Facts ("Pl. Resp.") ¶¶ 76-77, 132-33; Plaintiff's Statement of
Material Facts ("Pl. Statement") ¶¶ 31-32, 48-49.  On a motion for summary judgment, however, "allegations in an
unverified complaint cannot be considered as evidence." *Continental Ins. Co. v. Atlantic Cas. Ins. Co.*, No. 07-cv-
3635, 2009 WL 1564144, at *1 n.1 (S.D.N.Y. Jun. 4, 2009) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.

At all times relevant to this action, Plaintiff Marquez was employed as a detective with the NYPD. Pl. Resp. ¶¶ 3-6. From November 2010 until her retirement in August 2013, Detective Marquez was assigned to the 30th Precinct Detective Squad in northern Manhattan (the "30th Squad"). Pl. Resp. ¶¶ 4-6, 169. Defendant Castro, a Lieutenant, served as commander of the 30th Squad from July 2006 until December 2011, and then again from February 2012 until his own retirement in November 2013. *Id.* ¶¶ 13-15; *see also* Transcript of Deposition of Ruben Castro, dated September 9, 2015 ("Castro Dep."), at 28. In his capacity as commander, Castro supervised the 30th Squad's detectives and police officers, to some extent through his subordinate Sergeant Peter Holness. Castro Dep. at 28-29, 33, 40. During Castro's tenure as commander, the 30th Squad generally included approximately fifteen to twenty detectives. *Id.* at 29. With the exception of Plaintiff Marquez, all of these detectives were male. *Id.* at 29, 33; Pl. Resp. ¶ 140.

During Marquez's first year with the 30th Squad, she and Castro maintained a "professional" working relationship without any notable problems. Pl. Resp. at ¶ 16. In December 2011, Castro temporarily retired to attend to a family illness. Pl. Resp. ¶ 14. Castro returned to the 30th Squad in February 2012. *Id.* Between Castro's return in February and roughly December 2012, Castro and Marquez were periodically involved in a variety of workplace incidents that form the basis for this action. Pls. Resp. ¶ 168.

### A. February 2012 Incidents

On February 9, 2012, Marquez and Detective Glenn Morales, also of the 30th Squad, had a conversation in the 30th Precinct about plans to lose weight during the new year. Pl. Resp. ¶ 22; Transcript of Deposition of Lisa Marquez, dated October 2, 2015 ("Marquez Dep.") at 41. Marquez testified that Castro, who was in the vicinity of the conversation, interjected, telling Marquez she that did not need to lose weight and that he "like[d]" her the way she was – "nice and tight." Pl. Resp. ¶ 23; Marquez Dep. at 41-42. Marquez testified that she was offended by

---

1995)). Accordingly, the Court has not relied on any such allegations or credited any purported facts based exclusively on complaint allegations.

the comment, in part because she had never heard Castro make a similar remark to any male member of the 30th Squad, and that she told Castro "not to talk to her that way." Pl. Statement ¶ 4; Marquez Dep. at 41-42. Castro, for his part, denied ever making such a remark. Pl. Response at ¶ 24; Castro Dep. at 131.

On February 15, 2012, Detective Morales, while eating lunch in the lounge area of the male detectives' locker room, asked Marquez to accompany him during his investigation of certain cases that afternoon. Pl. Resp. ¶¶ 25-26; Marquez Dep. at 50. Marquez agreed, and went to retrieve her firearm from her locker. [2] Pl. Resp. ¶ 27. After opening her belt to slip her firearm through a loop and then adjusting it, Marquez asked Morales how long the investigations would take because, among other things, she had not yet had a chance to eat her own lunch. Pl. Resp. ¶ 28; Pl. Statement ¶ 6. Marquez testified that Castro, overhearing the question, commented, "What are you talking about you['re] hungry, you came with your pants all open from the lunch room with Glen [Morales]. What you mean you were eating." [3] Marquez Dep. at 55; Pl. Resp. ¶ 30. Marquez testified that she interpreted Castro's comment as a reference to oral sex, and said to Castro, "Don't fucking talk to me that way." Pl. Resp. ¶ 31; Marquez Dep.

---

[2] Because the 30th Precinct did not have a separate locker room for female detectives, Marquez shared a locker room with her male colleagues until at least November 2012, locking the door as necessary to ensure privacy when changing clothes. Pl. Resp. ¶¶ 137, 139; Castro Dep. at 69-70. It is undisputed that the 30th Squad detectives, including Marquez, favored this arrangement over the option of Marquez using the Precinct's female police officer locker room because the detectives, as a separate command, "preferred to stay together." Pl. Resp. ¶ 138.

[3] Plaintiff asserts both in her Local Rule 56.1 materials and in her opposition brief that Marquez further testified that Castro also told her, "When you had your pants opened, Glenn was eating you." *See* Pl. Resp. ¶ 30; Pl. Statement ¶ 7; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opp.") at 6. That is an inaccurate representation of Marquez's deposition testimony. While it is true that Marquez first testified at deposition that Castro "basically told [her]," "'[W]hen you had your pants open, Glen was eating you'" – "in somewhat of those words," *see* Marquez Dep. at 50-51, Marquez was subsequently asked to specify "precisely, to the best of [her] recollection, what words [Castro] use[d]." *Id.* at 51. In response, Marquez testified that Castro said, "'What do you mean that you have to eat. When you had your pants open, you were eating or he was eating.' I'm somewhat nervous, so somewhat he said that." *Id.* at 51. Later in her deposition, Marquez testified, and the parties now agree in their Local Rule 56.1 materials, that Castro said, "'[W]hat are you talking about you['re] hungry, you came with your pants all open from the lunch room with Glenn. What you mean you were eating.'" Marquez Dep. at 55; Pl. Resp. ¶ 30. The Court does not view the slightly varying versions of Castro's remark proffered by Plaintiff as material to the outcome of this case.

3

at 51, 58. Marquez further testified that Castro then quickly left the precinct. Marquez Dep. at

51. Castro, again, denied that this exchange took place. Pl. Resp. at ¶ 36; Castro Dep. at 67.

Marquez also testified that, on as many as three to four occasions, Castro began

conversations with or made remarks to Marquez and other detectives while in or coming from

the locker room "partially undressed." Pl. Resp. ¶ 38; Marquez Dep. at 69. During one such

incident in February 2012, Marquez testified, she and several of her male colleagues were sitting

at their desks in the 30th Precinct when Castro entered the locker room to take a shower. Pl.

Resp. ¶¶ 37-41. Shortly thereafter, Castro opened the locker room door while shirtless and with

a towel wrapped around his waist and asked Marquez – whose desk was less than twenty feet

from the locker room door – to take a message if he received any calls while in the shower. Pl.

Resp. ¶¶ 37-41. Castro did not make any sexual remarks or innuendoes at that time. Marquez

Dep. at 61.

Marquez later reported to the NYPD Office of Equal Employment Opportunity ("EEO")

that, on another occasion, Castro left the locker room with his "tank top open," flexed his

muscles, and said to Marquez, "You're invited to the gun show, [do] you want to feel it." Pls.

Resp. at ¶ 42; Investigating Officer's Report, EEO, dated November 7, 2012, at DEF 0286 (Dkt.

No. 65-18). Such encounters, Marquez reported, made her feel "uncomfortable." *Id.*

Marquez also testified that, at some point in February 2012, she observed Castro in the

30th Precinct massaging the back of Irene Gadsden, a female Police Administrative Assistant

who had been assigned to the Precinct since October 2007. Pl. Resp. ¶¶ 43-44; Marquez Dep. at

65. During the massage, Marquez testified, Castro's fingers "went . . . past the belt area, down

[Gadsden's] pants." Marquez Dep. at 65; Pl. Resp. ¶ 44. Marquez did not observe Gadsden

appearing uncomfortable or objecting to Castro's conduct, but nevertheless felt that the conduct

was inappropriate for the workplace and was offended by it. Marquez Dep. at 65, 67-68. During

two later interviews with EEO, Gadsden reported only that Marquez had massaged her shoulders

on several occasions. *See* Investigating Officer's Report, EEO, dated April 27, 2013, at DEF

0334 (Dkt. No. 65-14). Gadsden asserted during one such interview that these massages did not

4

make her feel "any way" in particular, that she did not feel that they were sexual in nature, and that she was "very comfortable" working with Castro. *Id.* at 0334-335; *see also* Pl. Resp. at ¶ 48. Castro, for his part, denied ever putting his hands down Gadsden's pants, but admitted occasionally placing his hands on her shoulders and at least once, with Gadsden's permission, applying pressure to her upper back to relieve a muscular knot. Castro Dep. at 122-23; Investigating Officer's Report, EEO, dated February 26, 2013 at DEF 0320 (Dkt. No. 65-12).

### B.    First Complaint to Office of Equal Employment Opportunity

On February 27, 2012, Marquez filed a complaint with the EEO, alleging that Castro had made a sexual comment to her two to three weeks earlier. Pl. Resp. ¶ 52; *see also* Investigating Officer's Report, EEO, dated March 15, 2012, at DEF 0254 (Dkt. No. 65-15). Marquez was scheduled for an interview with EEO on March 8, 2012. Pl. Resp. ¶ 53. At some point prior to the scheduled interview, however, Marquez had a conversation with Detective Ervin Urbina, also of the 30th Squad, during which Urbina encouraged Marquez to give union personnel an opportunity to address Marquez's concerns informally. Pl. Resp. ¶ 55. On the day before her scheduled interview, March 7, 2012, Marquez withdrew her complaint against Castro. Pl. Resp. ¶ 54; *see also* Investigating Officer's Report, EEO, dated March 7, 2012, at DEF 0255 (Dkt. No. 65-16).

### C.    Castro's Subsequent Interventions in Marquez's Investigations

Sometime later, in March 2012, Marquez interviewed a robbery victim in the 30th Precinct. Pl. Resp. ¶ 60. As part of her investigation, Marquez requested that the victim accompany her to the crime scene in a patrol car to look for the perpetrator. Marquez Dep. at 95. The victim, however, was reluctant to return to the scene. *Id.* Marquez testified that, as she attempted to console and persuade the victim to accompany her to the scene, Castro, overhearing the conversation, began to yell at the victim that the victim should not be scared to join Marquez and that victim was "going to go right now." *Id.* at 95-96; Pl. Statement ¶ 27. Marquez then requested that one of her colleagues who was nearby join them in the patrol car for the search for the perpetrator. Marquez Dep. at 96. In response, Marquez testified, Castro started to yell at

Marquez, accusing her of trying to "milk this," asking how long she thought the search would take. *Id.* at 96. Marquez felt that Castro was "interfering" in her investigation and "sabotaging [her] case." *Id.* at 95-96. Castro testified that he never yelled at Marquez while she was interviewing a robbery victim. Castro Dep. at 79.

On another occasion, Marquez arrested an individual suspected of another robbery. Castro Dep. 80-81. During an ensuing line-up conducted by Marquez and supervised by Castro, the robbery victim identified the suspect as a friend rather than as the perpetrator of the crime. Pl. Resp. ¶¶ 70-74; Castro Dep. at 80-81. Marquez nevertheless wished to interview the suspect further. Castro Dep. at 80-81. Castro informed Marquez, with the suspect still in the room, that she could not continue to interview the suspect and ordered the suspect released. Castro Dep. at 80-81. Castro later testified that at the time of his exchange with Marquez the suspect had already been in the precinct for over twenty-four hours and that Castro was concerned about holding the suspect illegally. Castro Dep. at 80-82; Pl. Resp. ¶ 75.

### D.     May – November 2012 Incidents

From late March 2012 to late May 2012, Marquez was on leave from work recuperating from knee surgery. Pl. Resp. ¶ 80. Upon her return to work, Marquez was placed on restricted duty, precluding her from actively making arrests. Pl. Resp. ¶¶ 81-82. Shortly thereafter, Castro had a meeting with Marquez in his office to discuss her recent arrest history. Pl. Resp. ¶ 83. Marquez testified that when she explained that she could not make arrests while on restricted duty, Castro told her that she was "useless" and "no good on the job." Pl. Resp. ¶¶ 83-84, Marquez Dep. at 98-99; Investigating Officer's Report, EEO, dated November 17, 2012, at DEF0286 (Dkt. No. 65-18). Marquez also testified that later, in July 2012, Castro asked Marquez how long she was going "to milk this injury." Marquez Dep. at 99; Pl. Resp. ¶ 87. Castro denied making any such comments. Castro Dep. at 93.

Sometime after May 2012, Castro informed Marquez that he had been ordered to change her schedule, that she could no longer work the alternating shifts that she had been working prior to her injury, and that she would have to choose a single afternoon, evening, or overnight shift.

Pl. Resp. ¶¶ 93-95. Marquez selected an 11:30 AM to 8:00 PM shift and was assigned accordingly. *Id.* ¶¶ 96-97. In late October 2012, Sergeant Holness informed Marquez that her shift had been changed again at the directive of Castro and that she would be assigned to work a 4:30 PM - 1:00 AM shift. *Id.* ¶¶ 99-101. Castro testified that the shift reassignment was intended to, among other things, prevent Marquez from accumulating excessive overtime. Castro Dep. at 95-96. Marquez testified that she believed that her shifts were changed in response to her internal complaint about Castro. Investigating Officer's Report, EEO, dated November 17, 2012, at DEF 0286 (Dkt. No. 65-18).

On November 1, 2012, Sergeant Holness advised Marquez of an assignment to complete "profile reports," an administrative task, for Castro (the "November 1 Assignment"). Pl. Resp. ¶ 104; Castro Dep. at 101. On November 6, 2012, Castro asked for the completed November 1 Assignment, and Marquez indicated that she had not done it. Pl. Resp. ¶¶ 105-07. Marquez testified that Castro then asked her repeatedly why she had not completed the November 1 Assignment, despite Marquez's explanation that she did not know how to complete profile reports and lacked necessary access to certain codes. Marquez Dep. at 102-03. Marquez further testified that, during this exchange, Castro "took his fists out." *Id.* at 103. When Marquez tried to leave Castro's office to call her union representative and report the incident, she testified, Castro got up from his seat and told Marquez, "Sit the hell down," "I'll tell you when you need a union rep," and that he was going to suspend her. *Id.* at 103-04. Marquez testified that she nevertheless walked out of Castro's office to call her representative, prompting Castro to follow yelling her name. *Id.* at 103. Marquez further stated that she entered the locker room to try to call her union representative and locked the door behind her. *Id.* at 104. According to Marquez's testimony, Castro then began banging on or kicking the door and shouting at her to "get out." *Id.* at 104-05. While Marquez was still in the locker room, she received a call on her cell phone from the 30th Squad's Captain, who instructed her to leave the office. *Id.* at 105. Marquez further testified that she then attempted to leave the office but forgot her keys in the locker room. *Id.* When she tried to return for her keys, Marquez testified, Castro initially

7

prevented her from entering the locker room and then resumed "banging on the door" and eventually got "up in [Marquez's] face" and started to yell at her to "get out, get out." *Id.*

Castro testified, with regard to this incident, that he initially tried to explain to Marquez in his office that the November 1 Assignment did not require certain steps that she thought it did and that she should be able to complete it. Castro Dep. at 101-02. He further testified that Marquez then told him that she would not speak to him without a union representative, "stormed out" of Castro's office, refused an order to return, and "locked herself" in the locker room for up to thirty minutes to an hour. *Id.* at 102; *see also* Command Discipline Election Report, dated November 6, 2012, at DEF 0378 (Dkt. No. 65-17). Castro denied kicking the locker room door, yelling or swearing at Marquez, and threatening or intimidating Marquez during any of this. *Id.* at 103-04. Castro also testified that his superiors, when informed of the incident, directed Castro to "write up" Marquez, which he did. *Id.* at 104.

Castro completed a Command Discipline Election Report (the "CD") noting that Marquez had violated NYPD rules and procedures by being "discourteous to a supervisor." Command Discipline Election Report, dated November 6, 2012 at DEF 0378 (Dkt. No. 65-17); *see also* Castro Dep. at 103, 114. Marquez testified that the CD was never actually issued to her, discussed with her, or adjudicated. Marquez Dep. at 114.

### E.     Second EEO Complaint and Subsequent Incidents

On November 7, 2012, Marquez contacted EEO and requested that the office reopen her February 2012 complaint against Castro. Pl. Resp. ¶ 130; Investigating Officer's Report, EEO, dated November 17, 2012 at DEF 0285 (Dkt. No. 65-18). EEO personnel interviewed Marquez on December 10, 2012, and, over the next several months conducted a preliminary investigation into her allegations, interviewing Castro, Gadsden, and several 30th Squad detectives. *See* Investigating Officer's Report, EEO, dated February 26, 2013 at DEF 0318-20 (Dkt. No. 65-12).

Marquez testified that, in December 2012, Castro informed Marquez he wanted the hanging plants that she kept in the precinct removed. Pl. Resp. ¶ 149; Marquez Dep. at 125-26. Marquez further testified that she did not remove her plants and, thereafter, Castro asked her

approximately once a week to take the plants down. Pl. Resp. ¶¶ 150-51. Castro denied ever telling Marquez to remove her plants. *Id.* ¶ 152.

Marquez also testified that, in early December 2012, an office holiday party was held in a timeslot during which she was schedule to work. Marquez Dep. at 122; Pl. Resp. ¶¶ 153, 155. Marquez further testified that Castro reminded her prior to the party that she was not permitted to change shifts in order to attend the party. *Id.* at 124-25. Four male detectives who originally had been scheduled to work during the party, Marquez testified, were permitted to change shifts and attend the party after finding a colleague to fill in for them. Pl. Resp. ¶¶ 156-58. Castro testified that he did not deny Marquez the opportunity to attend the party. Pl. Resp. ¶ 161.

### F.    EEO Recommendations and Aftermath

By reports dated February 26, 2013 and May 20, 2013, EEO personnel recommended that the preliminary investigation into Marquez's November 2012 complaint be closed, with no full investigation required. *See* Investigating Officer's Report, EEO, dated February 26, 2013, at DEF 0320 (Dkt. No. 65-12); Investigating Officer's Report, EEO, dated May 20, 2013, at DEF 0344 (Dkt. No. 65-20). EEO found no case of employment discrimination but did issue a "re-instruct[ion]" to Castro regarding the admitted physical contact with Gadsden. Investigating Officer's Report, EEO, dated February 26, 2013 at DEF 0320 (Dkt. No. 65-12). On May 9, 2013 the Deputy Commissioner of EEO issued a letter to Marquez stating that her complaint "could not be corroborated" and "did not rise to the level of employment discrimination" under Title VII or state or local law. *See* Letter from Neldra M. Zeigler to Marquez, dated May 9, 2013, at DEF 0382 (Dkt. No. 65-21); Pl. Resp. ¶ 167.

Marquez testified that, between December 2012 and August 2013, she continued to work under Castro's supervision, and had no complaints about any of her interactions with him. Pl. Resp. ¶ 169. Marquez further testified that the only time periods during which she experienced problems working with Castro were February 2012 and May – December 2012. *Id.* ¶ 168. Marquez retired from the NYPD in good standing in August 2013. Marquez Dep. at 26, 114, 127.

Marquez initiated the instant action on October 14, 2014.  Dkt. No. 1.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is warranted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).  The movant bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Id.* at 323.  A fact is material only if it "might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A moving party may satisfy its burden by demonstrating that the non-moving party, "after adequate time for discovery," has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) ("A defendant is entitled to summary judgment where the plaintiffs have failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim on which the plaintiffs bear the burden of proof.") (internal quotation marks omitted).

If the movant satisfies its burden, the nonmovant must then "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To defeat a motion for summary judgment, it must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and citation omitted).  In making this showing, the non-moving party cannot rely either on the "mere allegations or denials of his pleadings," *see id.* at 256, or on "mere speculation or conjecture as to the true nature of the facts," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986); *see also Ridinger v. Dow Jones & Co., Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) (noting that "conclusory statements, conjecture, and inadmissible evidence are

10

insufficient to defeat summary judgment") (internal quotation marks and citation omitted). Given the materiality requirement, moreover, "[f]actual disputes that are irrelevant or unnecessary" do not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

"When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys*, 426 F.3d at 553; *see also Anderson*, 477 U.S. at 255 (at summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"). "Assessment of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir. 1996); *see also Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) (at summary judgment, court "should not weigh the evidence or assess the credibility of witnesses."). The question for the Court at this stage is "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. Still, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

The Court of Appeals "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case . . . where the merits turn on a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks omitted). "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks omitted). Nevertheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It

is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

## III.   Discussion

### A.   Improper Defendant

As an initial matter, all claims asserted against the NYPD may be dismissed out of hand. Section 396 of the New York City Charter provides in pertinent part that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency." N.Y.C. Charter Ch. 17 § 396. This provision "has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008); *see also Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (noting that "NYPD is a non-suable agency of the City"); *Pesce v. N.Y.C. Police Dep't*, 159 F. Supp. 3d 448, 459 (S.D.N.Y. 2016) (granting summary judgment on all discrimination claims against NYPD). Accordingly, Plaintiff's claims against the NYPD must be dismissed.

The Court will consider in turn Plaintiff's claims against the remaining Defendants.

### B.   Title VII Hostile Environment Sexual Harassment Against the City[4]

In order to establish a claim for hostile work environment under Title VII, a plaintiff must "show that (1) 'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) 'a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Lekettey v. City of*

---

[4] Defendants argue that "[P]laintiff's claims under Title VII against defendant Castro should be dismissed." Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Br.") at 21. The Court construes Plaintiff's Complaint to assert Title VII claims only against the City and the NYPD. *See* Complaint (Dkt. No. 1) ("Compl.") ¶¶ 67-72. To the extent, however, that Plaintiff does assert Title VII claims against Defendant Castro, such claims are dismissed, as it is well-settled that "Title VII does not impose liability on individuals." *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) (collecting cases); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (noting that "'individuals are not subject to liability under Title VII'") (quoting *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (*per curiam*)).

*N.Y.*, 637 F. App'x 659, 661 (2d Cir. 2016) (ellipsis in original) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000)).  Further, "it is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citation omitted).

    "The kinds of workplace conduct that may be actionable under Title VII include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (internal quotation marks, brackets, and ellipsis omitted).  In considering whether a plaintiff has met its burden as to the sufficiency of the purported harassment, "courts should 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012) (alterations in original) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)); *see also Redd*, 678 F.3d at 176 (given the "totality of the circumstances" standard, the "court must take care . . . not to view the individual incidents in isolation" and "should not view the record in piecemeal fashion") (internal quotation marks and citation omitted).  "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility." *Leibovitz v. N.Y.C. Transit. Auth.*, 252 F.3d 179, 188 (2d Cir. 2001).  "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.  Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 375 (internal quotation marks and citation omitted).  Still, "it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.*  "In short, a plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was

13

extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" *Id.* (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code," and, "[p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).

Here, Defendants argue persuasively that the evidence that Plaintiff has adduced, even taken in the light most favorable to Plaintiff, reveals only conduct that is from an objective standpoint insufficiently pervasive or severe to constitute hostile environment sexual harassment. *See* Br. at 6-9; Defendants' Reply Brief in Support of Their Motion for Summary Judgment ("Reply Br.") at 1-3. In support of her hostile work environment claim, Plaintiff points to approximately six to seven discrete incidents involving Castro:

- Castro's February 9, 2012 comment that Plaintiff did not need to lose weight and that he "liked her the way she was" – "'nice and tight,'" *see* Opp. at 5-6;

- Castro's February 15, 2012 remark, "'What are you talking about you['re] hungry, you came with your pants all open from the lunch room with Glen [Morales]. What you mean you were[] eating,'" *see id.* at 6;

- A February 2012 incident in which Castro requested, while standing in the locker room door shirtless and wearing a towel around his waist, that Plaintiff take a message if anyone called while he was in the shower, *id.* at 7.

- Two or three additional, undated occasions on which Castro initiated conversations with or made comments to Plaintiff while "partially undressed," including one on which Castro, coming out of the locker room in a tank top, flexed his muscles and said to Plaintiff, "'You're invited to the gun show, you want to feel it?'", *id.* at 7-8; and

- An occasion in February 2012 on which Plaintiff observed Castro massaging Gadsden's back and, in so doing, putting his fingers "'past . . . [the] belt area, and down her pants,'" *id.* 8.

14

Crediting Plaintiff's version of these events, as it must at the summary judgment stage, the Court concludes that no reasonable jury could find that they rise to the level of actionable hostile environment harassment when considered under the totality of the circumstances. First, there is no genuine dispute that, viewed in the context of Marquez's nearly three-year tenure working under Castro's supervision on the 30th Squad, the incidents constituting the allegedly discriminatory conduct were infrequent, isolated, and limited to one relatively short time span, occurring largely – if not exclusively – during an approximately three-week period in February 2012. Indeed, Marquez testified that, other than "two or three" unspecified, undated occasions on which Castro had a conversation with Marquez while in the locker room and "partially undressed," Marquez did not experience any purportedly "sexually harassing acts" before or after February 2012. Marquez Dep. at 40, 69, 77, 127-28. As the Court of Appeals has recognized, episodes of purported harassment that "were few and occurred over a short span of time," do not support a demonstration of pervasiveness. *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58-59 (2d Cir. 2004) (no hostile environment when supervisor, within a one-month period, offered plaintiff various workplace privileges and monetary benefits in exchange for sex; threatened plaintiff with reassignment when she rejected him; and reduced plaintiff's hours); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) ("Incidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment.") (internal quotation marks omitted); *Spina v. Our Lady of Mercy Med. Ctr.*, 97-cv-4661, 2003 WL 22434143, at *3 (S.D.N.Y. Oct. 23, 2003), *aff'd* 120 F. App'x 408 (2d Cir. 2005) (summary judgment appropriate where plaintiff could "positively recall at most *six specific instances* of harassment" over 15 months of employment) (emphasis in original).

Of course, the hostile environment inquiry is not limited to "how long" the relevant course of conduct lasts; the "offensiveness of the . . . actions complained of" also requires careful consideration. *See Whidbee*, 223 F.3d at 69; *see also Cruz*, 202 F.3d 570 (even a single incident, if "extraordinarily severe," may evince a sex-based hostile environment under Title VII). Whether considered individually or on a cumulative basis, however, the incidents cited by Marquez are insufficiently severe "to overcome [their] lack of pervasiveness" and no reasonable jury could conclude that they support a hostile environment claim. *Mormol*, 364 F.2d at 59.

As a preliminary matter, there is no dispute that Castro did not make sexual advances toward Plaintiff, request sexual favors from Plaintiff, or engage in physical contact with Plaintiff. There is also no evidence in the record that any of the purportedly harassing conduct was physically threatening or interfered in any way with Plaintiff's work. Instead, Plaintiff's claim is premised on three offensive comments by Castro, three to four encounters with Castro emerging from the locker room less than fully dressed, and a suggestive massage given by Castro to one of Plaintiff's female colleagues.

Castro's comments concerning Plaintiff's "nice and tight" physical shape, his own "gun show" muscles, and the "open" state of Plaintiffs' pants during lunch – while no doubt inappropriate and boorish – are not, as an objective matter, sufficiently severe to be actionable under Title VII. These comments did not, for example, contain profanity, slurs, insults, or threats, and did not explicitly reference sexual acts or specific physical features. Indeed, they are, in this regard, similar to (or objectively less offensive than) other instances of largely non-physical conduct deemed insufficient to create a hostile work environment by other courts in this Circuit. *See, e.g., Alfano*, 294 F.3d at 370, 380-81 (reversing jury verdict for plaintiff subjected to a series of pranks, notes, and comments regarding her sex life, including insinuations of sexual

activity with carrots and references to inappropriate physical contact with plaintiff's

subordinate); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (summary

judgment for defendant where supervisor told plaintiff that she had been "voted the 'sleekest ass'

in the office" and deliberately touched her breasts with papers that he was holding); *Robinson v.*

*Purcell Constr. Corp.*, 859 F. Supp. 2d 245, 250-52, 255 (N.D.N.Y. 2012) (summary judgment

where plaintiff's co-workers called her a "bitch," asked if she knew the definition "of a cunt,"

and stated that she "must be ragging it today," and plaintiff's supervisor repeatedly told her in

front of her co-workers that she had a "fat ass"); *Spina* 2003 WL 22434143, at *3 (insufficient

severity where plaintiff's supervisor commented that she "looked good in tight pants," called her

a "bitch" twice, stuck his finger in her face, complimented her hair and eyes, and "constantly

leered at her and followed her") (internal quotation marks omitted); *Dawson v. Bumble &*

*Bumble*, 246 F. Supp. 2d 301, 327-29 (S.D.N.Y. 2003), *aff'd* 398 F.3d 211 (2d Cir. 2005)

(summary judgment where coworkers told homosexual plaintiff that "what she needed was sex

with a man" and that she and a transsexual colleague "should switch body parts").

The Court also notes that the context of certain of Castro's comments reinforces the

Court's conclusion as to their objective severity. The undisputed evidence demonstrates that at

least one of these comments (that concerning Plaintiff's physical shape) was an off-the-cuff

interjection made specifically in response to Plaintiff's remark about her desire to lose weight.

*See* Pl. Resp. ¶¶ 22-23. Such context, of course, does not render such a remark any less crude or

out-of-place in the work environment. But it does reinforce that it is properly viewed as the sort

of "offhand" or "teasing" comment which, even if "offensive, unprofessional, or childish," does

not support a viable Title VII claim. *Cadet v. Deutsche Bank Sec.*, 11-cv-7964, 2013 WL

3090690, at *9-10 (S.D.N.Y. Jun. 18, 2013) (internal quotation marks and citations omitted);[5]

*see also Dawson*, 246 F. Supp. 2d at 327-29 (in context of work environment and in light of

comments made by plaintiff, defendants' comments were nothing more than "the ordinary

tribulations of the workplace," amounting to "sporadic use of abusive language, gender-related

jokes, and occasional teasing") (internal quotation marks omitted).

  To contend that Castro's comments could indeed reasonably be found to have created a

hostile environment, Plaintiff relies in large measure on the Court of Appeals' decision in

*Kotcher v. Rose & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59 (2d Cir. 1992), and this Court's

decision in *Cruz v. N.Y. State Dep't of Corrs. & Cty. Supervision*, 13-cv-1335, 2014 WL

2547541 (S.D.N.Y. Jun. 4, 2014).  Op. at 6-7.  Such reliance is misplaced.  *Kotcher* concerned a

supervisor who "made numerous comments about [one plaintiff's] breasts and other parts of her

body" and on occasion "grabbed her, leaving bruises on her arm"; made comments about another

plaintiff's bodily "equipment" driving her sales; and, "on a regular basis," "pretended to

masturbate and ejaculate" at both plaintiffs' backs to "express his anger" with them.   957 F.2d at

61.  *Cruz*, meanwhile, involved allegations, taken as true, that the plaintiff's supervisor "*made

almost-daily comments for over three years*, remarking upon his physical appearance, gender,

and sexual attractiveness while smiling seductively, and implying sexual intent."  2014 WL

2547541, at *4 (emphasis added).  The Court has no trouble concluding that the combination of

unwanted physical aggression and repeated explicit references to sexual acts and bodily features

in *Kotcher*, and the sheer volume and frequency of the comments in *Cruz*, render the harassment

complained of in those matters far afield from that at issue here.

---

[5] Although *Cadet* involved a claim of race-based hostile environment under Title VII, "[g]enerally, the same standards apply to both race-based and sex-based hostile environment claims." *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 436 n.2 (2d Cir.1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Plaintiff's encounters with Castro emerging from the precinct locker room similarly fail to create an objectively hostile work environment. Plaintiff is able to provide supporting detail concerning only two such incidents: one in which Castro opened the locker room door with a towel around his waist and asked Plaintiff, seated at her desk less than twenty feet away, to take a message from anyone who called while he was in the shower; and another in which Castro walked out of the locker room in a tank top, flexed his muscles, and "invited" Plaintiff, to the "gun show." There is no evidence to suggest that Castro made any explicit sexual references, threats, or insults during these encounters, exposed himself, or attempted to touch Plaintiff in any way. Indeed, Plaintiff explicitly confirmed at deposition that the first such encounter involved no "sexual remarks or innuendos," Marquez Dep. at 61, and reported to EEO during a November 2012 intake call that the "gun show" remark referred only to Castro's physical strength and was "not a sexual comment," *See* NYPD EEO, Telephone Conversation with Lisa Marquez, dated November 7, 2012 (Plaintiff's Ex. C) (audio recording) at 10:21-35. Courts in this Circuit have deemed isolated incidents of plaintiffs encountering colleagues in states of partial undress insufficiently severe to create a hostile environment. *See Adams v. City of N.Y.*, 837 F. Supp. 2d 108, 118, 127 (E.D.N.Y. 2011) (summary judgment on standalone hostile environment claim where plaintiff's superior "opened the door" to his office "naked to the waist" and with "the zipper of his pants . . . down," "insisted that [plaintiff] come into the office," and then "directed [plaintiff] to lock the door until he got completely dressed"); *see also Duguie v. City of Burlington*, 161 F. App'x 177, 177-78 (2d Cir. 2006) (Summary Order) (affirming summary judgment on Section 1983 hostile environment claims[6] despite "several instances" of male police officers "undress[ing]" or "urinat[ing]" while female plaintiffs were cleaning locker room)

---

[6] "Section 1983 sexual harassment claims that are based on a 'hostile environment' theory . . . are governed by traditional Title VII 'hostile environment' jurisprudence." *Hayut*, 352 F.3d at 744-45.

(internal quotation marks omitted); *cf. Saile v. N.Y. State Dep't of Motor Vehicles*, 5:13-cv-1394,
2015 WL 6962688, at \*14 (N.D.N.Y. Nov. 9, 2015) (plaintiff's "coincidenta[l]" encounter with
male coworkers working shirtless on "two or three" occasions was "hardly unwanted nudity on a
regular basis") (internal quotation marks omitted).  Under the circumstances – and
notwithstanding Castro's sophomoric "gun show" comment – the same conclusion applies here.
No reasonable jury could find that the encounters complained of created a hostile work
environment.

　　　Plaintiff also suggests, citing *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir.
2010), that Castro's conduct was physically threatening, causing it to "'cross the line'" from
"'offensive or boorish conduct'" into "'actionable sexual harassment.'"  Opp. at 8 (quoting
*Kaytor*, 609 F.3d at 547).  Plaintiff may be correct that actions which are objectively physically
threatening can indeed have such an effect, but the conduct complained of here objectively falls
far short of the sort at issue in *Kaytor*.  There, a supervisor, in addition to making a variety of
sexually suggestive and offensive comments, told the plaintiff on "at least six occasions" that he
"wanted to 'choke' her" (including one instance in which he mused aloud about coming to her
home to do so); "often wished her dead, saying 'I'd like to see you in your coffin'"; and
explicitly threatened to kill her for reporting his conduct.  609 F.3d at 539-541.  As an objective
matter, Castro's appearances in a towel or tank top are insufficiently "physically threatening" to
push otherwise non-actionable conduct "[a]cross the line."  609 F.3d at 547.

　　　Finally, the massage that Plaintiff witnessed Castro administering to Gadsden does not
support a finding of objective severity.  While it is true, as Plaintiff notes, that "evidence of
harassment directed at other co-workers can be relevant to an employee's own claim of hostile
work environment discrimination," *Leibovitz*, 252 F.3d at 190, the record before the Court – even

when viewed in the light most favorable to Plaintiff – does not reflect harassment of Gadsden.
Plaintiff testified that, in her view, Gadsden did not appear to be uncomfortable receiving the
massage and did not object to Castro's conduct. Marquez Dep. at 67-68. Gadsden herself
ultimately informed EEO – after initially equivocating – that she did not perceive any back or
shoulder rub that she received from Castro to be "sexual in nature," that such contact did not
make her feel "any way" in particular, that she was "very comfortable" working with Castro, and
"ha[d] no issues with him." *See* Investigating Officer's Report, EEO, dated April 27, 2013, at
DEF 0335 (Dkt. No. 65-14). As a recent decision of this Court accurately concluded, "Plaintiff's
aversion to other people receiving massages" – assuming those people appeared "'okay' with
getting [the] massages" – "does not constitute a sexually hostile environment." *Toyama v.
Hasaki Rest., Inc.*, No. 13-cv-4892, 2014 WL 7234602, at *3 (S.D.N.Y. Dec. 18, 2014); *see also
Gale v. Primedia*, 00-cv-5700, 2001 WL 1537692, at *3-4 (S.D.N.Y. Dec. 3, 2001) (plaintiff
could not have sustained hostile work environment claim based on observations of consensual
kissing and caressing between her supervisor and co-worker).

The Court finds that based on Plaintiff's versions of the incidents described above,
whether considered individually or in the aggregate, no reasonable factfinder could conclude that
Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult . . .
sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive
working environment." *Howley*, 217 F.3d at 153. Accordingly, there is no triable issue of
material fact regarding Plaintiff's Title VII hostile environment claim, and summary judgment
thereon is warranted.[7]

---

[7] Defendants suggest that Plaintiff asserts a claim for gender discrimination under Title VII independent of her
hostile environment sexual harassment claim. *See, e.g.*, Br. at 12-15; Reply Br. at 5 n.2. It is not clear to the Court
that any such claim (for example, a discrete disparate treatment claim) is in fact asserted. *See* Compl. ¶¶ 67-69
(setting forth a single cause of action for "discriminat[ion] against Plaintiff because of her gender (sexual

## C.    Title VII Retaliation Against the City

Plaintiff next brings a claim for retaliation under Title VII.   Plaintiff asserts that, in response to her internal complaints of sexual harassment and her subsequent testimony before EEO, Defendants – largely through Castro – antagonized Plaintiff by, among other things: interfering in her robbery investigation; changing her shift schedule; making derogatory comments about Plaintiff's workplace contributions while on restricted duty status; berating and threatening to suspend Plaintiff for failing to complete an assignment; preventing Plaintiff from attending an office holiday party; and ordering Plaintiff to remove her hanging plants from the precinct. Op. at 13-18.

Claims for retaliation under Title VII are analyzed under the three-step burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Philip v. Gtech Corp.*, 14-cv-9261, 2016 WL 3959729, at *10 (S.D.N.Y. Jul. 20, 2016).  At the first step of the *McDonnell Douglas* framework, the plaintiff must establish a *prima facie* case that her employer retaliated against her, "demonstrating that (i) [s]he engaged in protected activity by opposing a practice made unlawful by Title VII; (ii) h[er] employer was aware of that activity; (iii) [s]he suffered a materially adverse employment action; and (iv) there was a causal connection between the protected activity and the adverse employment action." *Lee v. Starwood Hotels & Resorts Worldwide, Inc.*, 14-cv-5278, 2016 WL 3542454, at *8 (S.D.N.Y. Jun. 22, 2016) (internal quotation marks omitted) (citing *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014)).

---

harassment)") (emphasis in original).   To the extent, however, that the Complaint does assert an additional Title VII gender discrimination claim, Plaintiff has failed to refute or acknowledge that portion of Defendant's summary judgment papers contending that such claim should be dismissed, and the Court therefore deems that claim abandoned.  See *Williams v. City of N.Y.*, 04-cv-1993, 2005 WL 839103, at *11 (S.D.N.Y. Apr. 12, 2005) (Title VII claim could be deemed abandoned); *Pesce*, 159 F. Supp. 2d at 459 (claims against NYPD were abandoned); *Arias v. NASDAQ/AMEX Market Grp.*, 00-cv-9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003)  ("In his opposition papers, [Plaintiff] neither refutes nor even mentions [Defendant's] argument that [Plaintiff] has failed to raise a genuine issue of material fact on either his claim of disability discrimination or his claim of unlawful disclosure. Therefore, he has abandoned these claims, and they are dismissed.").

A purportedly retaliatory action is "materially adverse" if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted). "Actions that are 'trivial harms' – i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience' – are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68). "Material adversity is to be determined objectively, based on the reactions of a reasonable employee." *Id.* Nevertheless, "context matters," since "the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted) (citing *Burlington*, 548 U.S. at 69).[8] "[T]he alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (citing *Zelnick v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

Proof of a causal connection between the protected activity and the adverse employment action "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

In general, the burden of proof that a plaintiff must satisfy to establish a *prima facie* case of retaliation is "*de minimis*." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "In determining whether this initial burden is satisfied . . . the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.*

---

[8] In *Hicks*, the Court of Appeals expressly "analyzed" retaliation claims under Sections 1981 and 1983 "pursuant to Title VII principles." 593 F.3d at 164.

23

"If the plaintiff sustains [her] initial burden, 'a presumption of retaliation arises.'" *Hicks*, 593 F.3d at 164 (quoting *Jute*, 420 F.3d at 173).   The defendant may rebut the presumption by "articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (internal quotation marks omitted).   If the employer does articulate such a reason, then "the presumption of retaliation dissipates," *Jute*, 420 F.3d at 173, and "the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2528 (2013)).   "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action" so long as "[f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).   On the other hand, temporal proximity between the protected activity and the adverse employment action, while potentially sufficient to indirectly establish a causal connection at the *prima facie* stage, is "alone . . . insufficient to defeat summary judgment at the pretext stage." *Id.* at 845, 847.

### 1.      Plaintiffs Fails to Establish a Prima Facie Case

Defendants appear to concede that Plaintiff's complaints to the union and EEO constitute protected activities and that Defendants were aware of such activities.   Defendants argue, however, that Plaintiff fails to establish a *prima facie* case of retaliation because she does not identify any employment action that could be deemed "materially adverse" under the applicable standard and, even if she did, Plaintiff is unable to show the requisite causal connection between her protected activities and that materially adverse action.   Br. at 17-19; Reply Br. at 5-9.   The Court agrees that there this no genuine issue that Plaintiff has failed to carry even her *de minimis* initial burden of establishing a *prima facie* case.   Accordingly, summary judgment on Plaintiff's Title VII retaliation claim is warranted.

24

a.   **The Evidence Does Not Reflect Materially Adverse
Employment Action**

Plaintiff does not appear to argue that any of the cited retaliatory incidents constitutes a
materially adverse employment action in and of itself.  Instead, she contends that, together, they
created an actionable retaliatory hostile work environment.  Op. at 15.

In general, a retaliatory hostile work environment may indeed constitute materially
adverse employment action.  *See, e.g.*, 180 F.3d at 446 ("We adopt the view that unchecked
retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment
action so as to satisfy the second prong of the retaliation *prima facie* case.").  To establish that
"'a retaliatory hostile work environment . . . might dissuade a reasonable worker from reporting
activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs
[standalone] hostile workplace claims by showing that the incidents of harassment following
complaints were sufficiently continuous and concerted to have altered the conditions of [her]
employment.'"  *Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 137 (S.D.N.Y. 2015) (quoting *Rasco
v. BT Radianz*, 05-cv-7147, 2009 WL 690986, at \*15 (S.D.N.Y. Mar. 17, 2009)); *Smith v.
Westchester Cty. Dep't of Corrs.*, 12-cv-3941, 2014 WL 4384104, at \*8 (S.D.N.Y. Sept. 3, 2014)
(same); *see also Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) ("[W]e apply the same
standards in determining whether *retaliatory* harassment constitutes an adverse employment
action as we do in assessing whether harassment *imposed because of sex* works an actionable
alteration in the terms or conditions of employment.") (emphasis in original).

Plaintiff's retaliatory hostile environment claim is premised primarily on incidents in
which: (i) Castro yelled at a Plaintiff and a robbery victim in March 2012 while Plaintiff was
trying to convince the victim to join a search for the perpetrator, telling the victim that he or she
should not be scared to join the search and accusing Plaintiff of trying to "milk" the
investigation; (ii) Castro told Plaintiff in May 2012 following her knee surgery that she was
"useless" and "no good on the job"; (iii) Castro and Holness changed Plaintiff's schedule from
an alternating shift arrangement to an 11:30 AM – 8:00 PM shift in May 2012 and then again to

a 4:30 PM – 1:00 AM shift in October 2012; (iv) Castro berated Plaintiff on November 6, 2012 for failing to complete an administrative assignment, demanding to know why the work was not finished, telling Plaintiff among other things to "sit the hell down," "taking his fists out," threatening to suspend Plaintiff, and following Plaintiff to the locker room to "bang" or "kick" on the door while she attempted to call her union representative; (v) Castro prohibited Plaintiff in December 2012 from changing her work schedule to attend an office holiday party, while allowing several male colleagues to change their work schedules in order to attend; and (vi) Castro ordered Plaintiff, also in December 2012, to remove her hanging plants from the precinct.  Opp. at 15-18.  Assuming for purposes of this motion that all these events occurred as described by Plaintiff, it is evident to the Court that no rational jury could find that this conduct meets the "demanding" standard necessary to show a hostile work environment.  *Faragher*, 524 U.S. at 788.

The incidents complained of – six to seven in all – occurred over the course of more than nine months, rendering them "episodic" in nature and insufficiently "continuous and concerted" to be deemed pervasive.  *Alfano*, 294 F.3d at 374 (internal quotation marks omitted); *Ramos v. Marriot Int'l, Inc.*, 134 F. Supp. 2d 328, 348-49 (S.D.N.Y. 2001) (six gender-biased comments by supervisor and co-workers over six months insufficiently pervasive).  The incidents, both individually and collectively, also fall well short of the severity threshold established in this Circuit.  Indeed, they amount to little more than a series of the very sort of regrettably mundane workplace travails – temper flares, personality clashes, public chastisement, inconvenient schedules – that, while no doubt unpleasant, do not support Title VII claims.  *See, e.g., Hahn v. Bank of America Inc.*, 12-cv-4151, 2014 WL 1285421, at *23-24 (S.D.N.Y. Mar. 23, 2014) (approximately seven incidents in which supervisor "yelled or screamed" at plaintiff or "otherwise embarrassed her" in front of her co-workers and customers across a three-month period did not constitute retaliatory hostile environment) (collecting cases); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 672-79 (S.D.N.Y. 2012) (no hostile environment when plaintiff was "verbally abused," "cursed at" and "yelled at," physically blocked into a private

office, "falsely" accused of workplace misconduct and crimes, had "paper thrown at her," and had "repeated requests for . . . transfer and reassignment [made] by her supervisor"); *see also Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 235-36 (E.D.N.Y. 2014) (male supervisor following female lieutenant to parking garage in "menacing manner" and threatening to charge her with insubordination for refusing to remove window covering from her office insufficiently severe to constitute hostile environment); *Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 472-73 (S.D.N.Y. 2013) ("excessive scrutiny" from principal, "negative performance evaluations and . . . letters that contained scurrilous charges," "frequent[]" staring in "an effort to intimidate" plaintiff, required move to "poorly ventilated windowless office," and "refus[al] [of] training opportunities" did not constitute hostile work environment).

Nor could a reasonable jury conclude that the incidents complained of by Plaintiff satisfy the general retaliation standard of potentially "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 54 (internal quotation marks omitted). To the contrary, they are precisely the types of of "trivial harms," "petty slights," or "minor annoyances" that, as a matter of law, do not qualify as materially adverse. *Tepperwien*, 663 F.3d at 568 (internal quotation marks omitted); *see also Burlington*, 548 U.S. at 68 (recognizing that personality conflicts at work that generate antipathy, snubbing by supervisors and co-workers, the sporadic use of abusive language, and simple lack of good manners are generally not actionable under Title VII's antiretaliation provision); *Martinez v. N.Y.C. Dep't of Educ.*, 04-cv-2728, 2008 WL 2220638, at *12 (S.D.N.Y. May 27, 2008) (incidents of supervisor publicly yelling at plaintiff and calling him "shit" constituted "petty slights and personality conflicts" that could not support retaliation claim); *Petyan v. N.Y.C. Law Dep't*, 14-cv-1434, 2015 WL 4104841, at *4 (S.D.N.Y. Jul. 2, 2015) ("Schedule changes and close monitoring do not constitute adverse actions in the retaliation context.") (citing *Tepperwien*, 663 F.3d at 568); *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 507-08 (S.D.N.Y. 2013) (confrontation with supervisor regarding scheduling that plaintiff found "uncomfortable" and caused to her to fear for her "physical safety" not a materially adverse

employment action); *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 61 (D.D.C. 2011) ("no reasonably jury could find that not being invited to an office holiday party . . . would dissuade a reasonable employee from supporting of a charge of discrimination").

Finally, Plaintiff appears to suggest in passing that EEO's disposition of her internal complaint itself constitutes, or at least contributes to, materially adverse employment action sufficient to support a retaliation claim. Op. at 18. This argument, which is unsupported by any authority, proves too much. Plaintiff may dispute EEO's findings that her allegations could not be corroborated and, in any event, did not rise to the level of employment discrimination. But if such findings were to qualify as materially adverse employment action, that would mean, in essence, that it would be "reasonable" for any employee to be "dissuaded" from making or supporting a discrimination charge purely by the prospect of an unfavorable resolution of that charge. *Burlington*, 548 U.S. at 68 (internal quotation marks omitted). That conclusion would be inconsistent with Title VII's "entire scheme for the efficient and timely adjudication of employment disputes," "integral" to which is "the principle that a complainant must fully exhaust [her] administrative remedies *prior* to filing a court action." *McGuire v. U.S. Postal Serv.*, 749 F. Supp. 1275 1287-88 (S.D.N.Y. 1990) (emphasis in original) (citing *Brown v. Gen. Servs. Admin.*, 425 U.S. 820 (1976)). Accordingly, the Court sees no basis to adopt it.

For the foregoing reasons, the Court concludes that no reasonable jury could conclude that Plaintiff has made a *prima facie* showing that she suffered a materially adverse employment action in purported retaliation for her protected activities.

### b.      Plaintiff Does Not Make a *Prima Facie* Showing of Causal Connection

Even assuming *arguendo* that certain of the comparatively more objectively "serious" incidents of which Plaintiff complains – the November 6 confrontation with Castro, for example – could potentially be found to constitute materially adverse employment action, Plaintiff has failed as a matter of law to make a sufficient *prima facie* showing of causation to survive summary judgment. Plaintiff attempts to establish the requisite causal link by relying

entirely on the purported temporal proximity between her February 2012 internal complaints and the alleged retaliatory conduct. Op. at 19-20. It is true both that a plaintiff may demonstrate causation at the *prima facie* stage "indirectly through temporal proximity," *Zann* Kwan, 737 F.3d at 845, and that the Court of Appeals "has not drawn a bright line defining," with specificity, "the outer limits beyond which a temporal relationship is too attenuated to establish causation," *Gorzynski*, 596 F.3d at 110. But the Supreme Court has recognized that if the only proffered evidence of causation is temporal proximity, that evidence uniformly passes muster only where "the temporal proximity is 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). With the exception of the March 2012 incident on which Castro yelled at Plaintiff and a robbery victim – which could not itself qualify as a materially adverse employment action – the conduct of which Plaintiff complains occurred at least three months and, in several important cases, more than eight months after Plaintiff first submitted complaints to EEO and the union in February 2012. Especially without additional circumstantial evidence of a causal link, Plaintiff cannot rely on such an attenuated temporal relationship to establish a *prima facie* case of causation. *See, e.g.*, *Peguero-Miles v. City Univ. of N.Y.*, 13-cv-1636, 2015 WL 4092336, at *11 (S.D.N.Y. Jul. 6, 2015) (seven-month lapse between protected activity and adverse action made inference of causation "exceedingly weak"). For this additional reason, summary judgment on Plaintiff's Title VII retaliation claim is appropriate.

### D.      NYCHRL Claims Against the City and Castro

Having disposed of Plaintiff's Title VII claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims under the NYCHRL. *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (*per curiam*) (noting that "when the federal claims are dismissed the 'state claims should be dismissed as well'") (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994)); *see also Belton v. City of N.Y.*, 12-cv-6346, 2014 WL 4798919, at *9 (S.D.N.Y. Sept. 26,

29

2014) (declining supplemental jurisdiction over NYCHRL after granting summary judgment on Title VII claims).

**IV.      Conclusion**

For the reasons articulated above, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's Title VII claims, and the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims under the NYCHRL.

The Clerk of Court is respectfully directed to terminate Dkt. No. 62 and to close this case.


SO ORDERED.

Dated: September  12  , 2016
         New York, New York

_____
ALISON J. NATHAN
United States District Judge

30